UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HORACE LEE,

      Plaintiff,

                                     CASE NO.  2:11-cv-14998

v

                                     Hon. Victoria A. Roberts

LIBERTY MUTUAL INSURANCE
COMPANY,
                                     Magistrate Judge R. Steven Whalen

      Defendant.

| | |
|---|---|
| OLSMAN, MUELLER, WALLACE & MACKENZIE, P.C. | JERALD VAN HELLEMONT (P32173) |
| WOLFGANG MUELLER (P43728) | PATRICK M. ANTHONY (P61344) |
| Co-Counsel for Plaintiff | HEWSON & VAN HELLEMONT, P.C. |
| 2684 West Eleven Mile Road | Attorney for Defendant |
| Berkley, MI  48072 | 25900 Greenfield Road, Suite 326 |
| (248) 591-2300 | Oak Park, MI  48237 |
| wmueller@olsmanlaw.com | (248) 968-5200 |
| dmackenzie@olsmanlaw.com | jvh@vanhewpc.com |
| | panthony@vanhewpc.com |

WILSON YOUNG, PLC
DOUGLAS YOUNG (P43808)
Co-Counsel for Plaintiff
1 Woodward Avenue, Suite 2000
Detroit, MI  48226
(313) 962-0800
dyoung@wilsonyoungplc.com

**DEFENDANT, LIBERTY MUTUAL INSURANCE COMPANY'S, MOTION
FOR PARTIAL SUMMARY JUDGMENT REGARDING
PLAINTIFF'S CLAIM FOR BAD FAITH**

**ORAL ARGUMENT REQUESTED**

**CERTIFICATE OF SERVICE**

NOW COMES the Defendant, Liberty Mutual Insurance Company, by and through its attorneys, Hewson & Van Hellemont, P.C. and for its Motion for Partial Summary Judgment Regarding Plaintiff's Claim for Bad Faith, states as follows:.

1.     That on or about October 2011, Plaintiff commenced this litigation which arises out of Plaintiff's claim for entitlement to insurance proceeds allegedly due and owing in connection with a fire loss to Plaintiff's dwelling that occurred on October 23, 2010 damaging his home and the personal property within that home.

2.     That the complaint in this matter alleges that Plaintiff and the Defendant were parties to a policy of homeowner's insurance including provisions for payment by the Defendant in the event of a fire loss to Plaintiff's insured premises and personal property from the Plaintiffs' insured premises.

3.     That Plaintiff's initial complaint alleges breach of contract by the Defendant relative to the failure of the Defendant to pay certain insurance benefits to the Plaintiff arising out of a fire loss reported to have occurred on October 23, 2010.

4.     That in February 2013, Plaintiff filed a Second Amended Complaint adding Count II which alleges a claim for bad faith in the denial Plaintiff's claim.

5.     That as part of the bad faith claim Plaintiff is seeking damages for mental, emotional and financial distress and a variety of similar exemplary damages against Defendant in reference to the claim submitted by the Plaintiff.

5.     In breach of contract suits and insurance contract suits, damages recoverable are those that arise naturally from the breach of contract, or those that were in contemplation of the parties at the time the contract was made. *Hadley v Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854); *Kewin v Massachusetts Mutual Life Insurance Company*, 409 Mich 401; 295 NW2d 50

2

(1980).

6.      That the alleged claim for bad faith seeking damages for emotional distress, mental anxiety and other exemplary damages alleged in Plaintiff's Second Amended Complaint did not arise naturally from the alleged breach of contract, nor were they in the contemplation of the parties at the time the contract was entered into by the parties.

7.      That Plaintiff's complaint failed to state a cause of action as to which relief can be granted with regards to extra contractual damages, including emotional distress, and other miscellaneous claims for alleged bad faith by the Defendant, and there are no genuine issues as to any material fact as to the Plaintiffs' inability to recover extra contractual bad faith or emotional distress damages in this breach of contract action.

8.      That Defendant is entitled to partial summary judgment as a matter of law pursuant to FRCP 56(c) with regard to such claims.

9.      That, for the sake of argument, applying the definition of bad faith as stated in *Commercial Union Ins. Co. v. Liberty Mutual Ins. Co*., 426 Mich. 127; 393 N.W.2d 161 (1986), "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owned a duty", there is no evidence to support that Defendant acted in bad faith in denying Plaintiff's claim.

10.     There was a conference between attorneys in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought.

WHEREFORE, Defendant, Liberty Mutual Insurance Company, prays that this Honorable Court grant partial summary judgment as to any and all causes of action set forth in Plaintiff's Second Amended Complaint for exemplary damages for bad faith and emotional

distress and grant such other relief as this Court deems appropriate.

Respectfully submitted,

**Hewson & Van Hellemont, P.C.**

BY:      /s/ Jerald Van Hellemont
         Patrick M. Anthony (P61344)
         Jerald Van Hellemont (P32173)
         Attorney for Defendant
         25900 Greenfield Road, Suite 326
         Oak Park, MI  48237
         (248) 968-5200
         JVH@vanhewpc.com
         (P61344)

Dated:  September 24, 2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HORACE LEE,

     Plaintiff,

                            CASE NO.  2:11-cv-14998

v

                            Hon. Victoria A. Roberts

LIBERTY MUTUAL INSURANCE
COMPANY,
                            Magistrate Judge R. Steven Whalen

     Defendant.

| | |
|---|---|
| OLSMAN,  MUELLER,  WALLACE  &  MACKENZIE, P.C.<br>WOLFGANG MUELLER (P43728)<br>Co-Counsel for Plaintiff<br>2684 West Eleven Mile Road<br>Berkley, MI  48072<br>(248) 591-2300<br>wmueller@olsmanlaw.com<br>dmackenzie@olsmanlaw.com<br><br>WILSON YOUNG, PLC<br>DOUGLAS YOUNG (P43808)<br>Co-Counsel for Plaintiff<br>1 Woodward Avenue, Suite 2000<br>Detroit, MI  48226<br>(313) 962-0800<br>dyoung@wilsonyoungplc.com | JERALD VAN HELLEMONT (P32173)<br>PATRICK M. ANTHONY (P61344)<br>HEWSON & VAN HELLEMONT, P.C.<br>Attorney for Defendant<br>25900 Greenfield Road, Suite 326<br>Oak Park, MI  48237<br>(248) 968-5200<br>jvh@vanhewpc.com |

**DEFENDANT, LIBERTY MUTUAL INSURANCE COMPANY'S, BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S CLAIM FOR BAD FAITH**

## <u>TABLE OF CONTENTS</u>

Index of Most Controlling Authority ........................................................................... iii

Statement of Issue Presented ................................................................................... iv

Introduction ............................................................................................................. 1

Statement of Facts ................................................................................................... 1

Standard of Review .................................................................................................. 5

Law and Argument ................................................................................................... 6

Relief Requested ...................................................................................................... 25

Certificate of Service ............................................................................................... 26

## INDEX OF MOST CONTROLLING AUTHORITY

**Cases:**

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 ....................................................5

*Celotex Corp. v. Catrett,* 477 U.S. 317; 106 S.Ct. 2458; 91 L.Ed.2d 265 (1986) ...............5,6

*City of Wakefield v. Globe Indemnity Co.,* 246 Mich 645; 225 NW 643 (1929) ................. 14-16

*Crossley v. Allstate Ins. Co.,* 139 Mich.App. 464; 362 N.W.2d 760 (1984) ........................ 12

*Dobbelaere v Auto Owners Insurance Company,* 275 Mich App 527, 530;
    740 NW2d 503 (2007) ............................................................................ 7

*Frankenmuth Mutual Insurance Company v Masters,* 460 Mich 105, 111-112;
    595 NW2d 832 (1999) ............................................................................ 7

*Henderson v State Farm Fire & Casualty Company,* 460 Mich 348, 354;
    596 NW2d 190 (1999) ............................................................................ 7

*Kewin v Massachusetts Mutual Life Insurance Company,* 409 Mich 401;
    295 NW2d 50 (1980) ...................................................................8-11,13,16

*Klapp v United Insurance Group Agency, Inc.,* 468 Mich 459, 467; 663 NW2d 447 (2003)

*Matsushita Elec. Indus.* Co. *v. Zenith Radio Corp* ., 475 U.S. 574, 587 (1986) ....... 5,6

*Stockdale v. Jamison,* 416 Mich 217; 330 NW2d 389 (1982) ............................................. 15,16

*Tenneco, Inc. v Amerisure Mutual Insurance Company,* 281 Mich App 429, 444;
    761 NW2d 846 (2008) ............................................................................7,

*Wendt v Auto Owners Insurance Company,* 156 Mich App 19; 401 NW2d 375 (1986) ...... 11,12

**Statues**

MCLA 29.4 ..........................................................................................2,4,18,19

MCLA 500.4507 ..........................................................................................4,18

MCLA 500.4509(3) ..........................................................................................19

**Court Rules:**

F.R.Civ.P. 56(c) ..................................................................................... 5

## <u>STATEMENT OF ISSUE PRESENTED</u>

Whether This Honorable Court Should Grant Partial Summary Judgment In Favor Of Defendant, Dismissing Plaintiff's Allegation Of Bad Faith When Non-Contractual Claims Of Bad Faith Are Not Permitted Under Michigan Law In Litigation Seeking Insurance Proceeds in Connection With A Fire Loss To Plaintiff's Dwelling As Bad Faith Damages Do Not Arise Naturally From The Alleged Breach Of Contract, Nor Were They In The Contemplation Of The Parties At The Time The Contract Was Entered Into By The Parties?

## INTRODUCTION

This litigation arises out of Plaintiff's claim for entitlement to insurance proceeds allegedly due and owing in connection with a fire loss to Plaintiff's dwelling that occurred on October 23, 2010 damaging his home and the personal property within that home.  Plaintiff's Complaint is seeking damages for breach of contract and the non-contractual claim of bad faith.

Ultimately, Liberty Mutual denied Plaintiff's insurance claim and primarily defends this action on the basis of arson, for which Plaintiff had a wrongful connection to the fire, as well as other misrepresentations perpetrated by the Plaintiff during his presentation of the claim.  The denial was based, in part, on the findings of Kevin Pike, an Origin and Cause investigator hired by Liberty Mutual to investigate the cause of the fire.   Kevin Pike concluded that the fire was incendiary; in other words, that it was an arson fire.

Defendant seeks summary judgment from this Honorable Court, not on the basis of sound-bytes self-servingly culled from various transcripts and documents, but rather, as discussed in greater detail below, based upon the fact that non-contractual claims such as bad faith are simply not permitted under Michigan law in litigation seeking homeowner's insurance proceeds in connection with a fire loss to plaintiff's dwelling that damaged his home and personal property within the dwelling.

## STATEMENT OF FACTS

Plaintiff submitted a homeowner's insurance claim with Defendant for damages that were sustained to his home and the personal property in the home as a result of the October 23, 2010 dwelling fire.   In good faith, Defendant issued payments to the Plaintiff totaling $28,791.00. The payments consisted of Additional Living Expenses ("ALE") so that Plaintiff would have a place to stay, an advance so that Plaintiff could purchase clothes and other necessary items and

Board-Up expenses to secure the dwelling.  (***Exhibit 1***).   Furthermore, Defendant also agreed to pay the DTE, water and gas bill to keep the water pipes from bursting in the winter months.

On October 25, 2010, Large Loss Adjuster Shane Moon first arrived at the scene to assess the damages.  When he arrived, representatives from the Redford Township Police and Fire Department, Det/Sgt Kevin Crittenden and Lt Dave Garland, were already present conducting their own independent origin and cause investigation to determine how he fire started.  (***Exhibit 2, p. 36 of 38, claim log notes***).

As standard protocol, Mr. Moon recommended that Defendant conduct an origin and cause investigation "in order to determine subro[gation] potential."   The matter was referred to certified fire investigator, Kevin Pike, who at the time was employed by Preferred Investigations. Kevin Pike conducted his origin and cause investigation on October 28, 2010 and determined this fire started in the master bedroom and that it was an incendiary fire that occurred to a secure, unoccupied dwelling.  (***Exhibit 3, Pike Origin and Cause Report***).   Brandon Klosterman, also a certified investigator who was employed with Preferred Investigations conducted a recorded interview of Plaintiff at that time.

After Kevin Pike concluded that this was an incendiary fire, in November 2010, the matter was referred to Kevin O'Reilly, an investigator for Defendant and a retired veteran of the Dearborn Police Department.  During the claim investigation, adjusters Kevin Moon and Cynthia Best continued to evaluate the damages to the dwelling and personal property, respectively, and worked with Plaintiff's public adjuster in submitting and reviewing inventory forms.  (**See Exhibit 2**).

Defendant then received a request from Det/Sgt Crittenden dated November 1, 2010, pursuant to MCLA 29.4 of the Fire Prevention Code, requesting Defendant's insurance

information relating to Plaintiff's home and their fire investigation file materials.   (***Exhibit 4***).
Defendant had an obligation to comply with this request.

On December 10, 2010, Kevin O'Reilly conducted a recorded interview of Plaintiff.
(***Exhibit 5).***      At that time, he advised Mr. O'Reilly as to his whereabouts the evening of the
loss.  He stated that he had gone to a surprise birthday party early that evening, returned home at
the party to change his clothes and then left again to go to Lucky's bar in Southfield near 12 mile
and  Telegraph.  The bar is approximately 10 minutes north of his home and the quickest route is
Telegraph.   We he left that evening to go to Lucky's he indicated that he secured the home and
he did not believe he had lit any candles. (**See *Exhibit 5, p. 57-59, 48***).   He also stated that the
only items he removed from the home aft the fire were some rings belonging to his brother and
"a little cash".   (***Exhibit 5, p. 55).***

On December 13, 2010, Kevin O'Reilly continued with his investigation conducting a
neighborhood canvass.

On December 14, 2010 Det/Sgt Kevin Crittenden contacted Kevin O'Reilly and informed
him that he had obtained cell tower tracking information on Plaintiff's cell phone and that
information placed Plaintiff at or near the scene of the fire when the 911 call was made at 11:57
p.m. by a neighbor.   In addition, the cell tower information placed Plaintiff in an area
inconsistent with statements to date.

Thereafter, as Defendant is contractually permitted to do, they requested the examination
under oath ("EUO") of the policyholder, Plaintiff.  On January 19, 2011, Defendant received a
retention letter from attorney Elliot Kramer advising that he would be representing Plaintiff at
the EUO.   (***Exhibit 6***).  The EUO was originally scheduled for February 17, 2011, however, it
was postponed at Plaintiff's request to March 14, 2011.

During the EUO Plaintiff provided the full names and contact information for his witnesses.  He also, for the first time, mentioned that he had visited his sister Vanessa Ervin, the night of the fire loss.  Following the EUO, Plaintiff was requested to provide additional documentation.  Plaintiff's counsel provided that documentation on March 23, 2011.  Kevin O'Reilly proceeded to contact the multiple witnesses and obtain statements.

On April 18, 2011, Det/Sgt Crittenden contacted Kevin O'Reilly advising him that he had submitted a request for warrant review with the Wayne County Prosecutors Office Arson Section.  (**See *Exhibit 2, p. 14 of 38).***  Crittenden also determined that this was an incendiary fire. (***Exhibit 7).***

Kevin O'Reilly concluded his investigation in May 2011 and submitted his recommendation for claim denial on June 2, 2011.   According to the claim log notes, Keven O'Reilly stated that, "Regardless of the criminal investigation status, I am recommending denial of this claim for material misrep and fraud."   (**See *Exhibit 2, p. 9***).  The recommendation for denial was based in part on (1) Kevin Pike's Origin and Cause Report that determined this was an incendiary fire, (2) multiple inconsistent statements from the Plaintiff regarding his activities and whereabouts around the time of the fire, (3) Cell phone tower information from Det/Sgt Kevin Crittenden and, (4) Plaintiff's 2007conviction for insurance fraud relating to an auto theft claim.

On June 14, 2011 a denial letter was sent the Plaintiff, in care of his attorney Elliot Kramer.  (***Exhibit 8).***

Only July 1, 2011, Wayne County Prosecutor Louisa Papalas submitted a request to Defendant pursuant to MCLA 500.4507 of the Insurance Code and MCLA 29.4 of the Fire Prevention Code, requesting Defendant's investigation materials.  (***Exhibit 9***).

Plaintiff filed this instant lawsuit seeking damages for breach of contract in October 2011.   The Wayne County Prosecutor issued a warrant for Plaintiff arrest at the end of January 2012. Representatives from Defendant received **subpoena's** compelling them to testify at the Preliminary Examination on February 28, 2012.   (**See** *Exhibit 2, p. 1 of 38*). The Preliminary Examination was later rescheduled for March 20, 2012.    The criminal trial was concluded in August 2012 and Plaintiff was sentenced in November 2012.     Plaintiff then filed a Second Amended Complaint in February 2013 adding a claim for bad faith which reads as follows:

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c).   The moving party bears the initial burden of showing that there is no genuine issue of material fact with respect to the claim or defense raised in the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323; 106 S.Ct. 2458; 91 L.Ed.2d 265 (1986).

The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *ld.* at 322

Once the moving party has met its burden, the non- moving party must come forward with specific facts to show that there is a genuine issue for trial.   *Matsushita Elec. Indus.* Co. *v. Zenith Radio Corp* ., 475 U.S. 574, 587 (1986).   To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248.   The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact." ld. at 247-48.   Material facts are only those facts that might affect the outcome of the action under the governing substantive law. *Ld.* The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus* Co., 475 U.S. at 587.   In short, the non-moving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings or by presenting a mere scintilla of evidence in support of its position, but must present significant probative evidence in support of its position to defeat the motion for summary judgment. *Celotex Corp.,* 477 U.S. at 324.  If the disputed evidence is "merely colorable... or not significantly probative... summary judgment may be granted. " Anderson, 477 U.S. at 251-52.   The central issue is whether the evidence presents a sufficient dispute to require submission to a jury at trial or whether the evidence is so one-sided that  one party must prevail as a matter of law. *ld*. 249-50.

## LAW AND ARGUMENT

**I.  PLAINTIFF'S COMPLAINT SEEKING DAMAGES FOR BAD FAITH SHOULD BE DISMISSED WITH PREJUDICE AS NON-CONTRACTURAL CLAIMS SUCH AS BAD FAITH ARE NOT PERMISSABLE UNDER MICHIGAN LAW IN LITIGATION SEEKING INSURANCE PROCEEDS IN CONNECTION WITH A FIRE LOSS TO PLAINTIFF'S DWELLING  AS BAD FAITH DAMAGES DO NOT ARISE NATURALLY FROM THE BREACH OF CONTRACT, NOR WERE THEY IN CONTEMPLATION OF THE PARTIES AT THE TIME THE CONTRACT WAS MADE.**

Plaintiff's Complaint, filed in October 2011 alleged a single count for breach of contract for non-payment of insurance benefits arising from the October 2010 fire loss.  Plaintiff then filed a Second Amended Complaint on February 28, 2013 adding Count II which seeks damages for bad faith.  Plaintiff alleges that as a result of the denial of his claim he suffered emotional distress, an inability to sell his property as well as extreme financial hardship.   Now, nearly two

6

years after the original lawsuit was filed, Plaintiff is requesting that the Court award him damages for these non-contractual damages.  Upon examination of the applicable law, however, it is clear that in Michigan, Plaintiff cannot recover damages for bad faith arising out of a breach of contract.

### A.  General Rules Regarding Contractual Interpretation

An insurance policy is like any other contract in that it is an agreement between its parties.  *Tenneco, Inc. v Amerisure Mutual Insurance Company,* 281 Mich App 429, 444; 761 NW2d 846 (2008).  The terms of an insurance policy are interpreted in accordance with the well-established principals of contract construction.  See *Henderson v State Farm Fire & Casualty Company,* 460 Mich 348, 354; 596 NW2d 190 (1999).  Similar to interpretation of statutes, an insurance contract must be construed to give effect to each word, clause, and phrase, and its interpretation should give every word or phrase its usual meaning.  *Klapp v United Insurance Group Agency, Inc.,* 468 Mich 459, 467; 663 NW2d 447 (2003).  The goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties.  *Dobbelaere v Auto Owners Insurance Company,* 275 Mich App 527, 530; 740 NW2d 503 (2007).  If the language is clear and unambiguous, the contract must be interpreted and enforced as written.  *Frankenmuth Mutual Insurance Company v Masters,* 460 Mich 105, 111-112; 595 NW2d 832 (1999).

### B.  Plaintiff's Damages Are Limited To The Monetary Value Of The Insurance Policy.

Plaintiff's Homeowner's Insurance Policy states:

"**Loss Settlement.**  Covered property losses are settled as follows:

    a. Property of the following types:
       (1)  Personal property;
         ***

At ***actual cash value at the time of loss*** but not more than the amount required to repair or replace.

b.  Buildings under Coverage A or B at ***replacement cost*** without deduction for depreciation, subject to the following:

   \*\*\*

   (2)  If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

   (a)  The ***actual cash value*** of that part of the building damaged;

      \*\*\*

   (4)  We will pay no more than the ***actual cash value of the damage until actual repair or replacement is complete***.   Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b. (2) above.

Policy at Pg. 9. (Emphasis added).  (***Exhibit 10).***

In the case *Kewin v Massachusetts Mutual Life Insurance Company*, 409 Mich 401; 295 NW2d 50 (1980), the Michigan Supreme Court considered Plaintiff's claim for exemplary damages arising out of the non-payment of benefits alleged to be due under disability insurance policy. Plaintiff alleged that he has suffered mental anguish as a result of the refusal to honor this claim. The Court found that ***the insurance contract was of a commercial nature and, as such, damages were limited to the monetary value of the contract had the Defendant fully performed its obligations***. *Id*. at 414-15.  The Court stated that,

> In the commercial contract situation, ***unlike the tort*** and marriage contract actions, ***the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation***.   The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith.

Id. at 420 (citing *Durfee v. Newkirk*, 83 Mich. 522, 527, 47 N.W. 351 (1890); *Caradonna v. Thorious*, 17 Mich.App. 41, 169 N.W.2d 179 (1969).

In *Kewin*, the Michigan Supreme Court relied upon the rule in *Hadley v Baxendale*, 9

8

Exch. 341, 156 Eng. Rep. 145 (1854), and reaffirmed the principal that damages in a breach of contract action are limited to damages arising naturally from the breach of those contemplated by the parties at the time the contract is made.   *Id*. According to the *Kewin* court, exemplary damages do not arise naturally from a breach of contract and as such are not recoverable thereunder.  *Id*. at 419.  Further, the Court stated that there is no recognizable cause of action for a bad faith breach of an insurance contract upon which such exemplary damage claims may rest. Id. at 423.

A long line of cases subsequent to *Kewin* has continued to affirm the rule that damages for mental and emotion distress are not available for breach of contract.

In *Chrum v Charles Heating and Cooling, Inc*, 121 Mich App 17; 327 NW2d 568 (1982), Plaintiff's brought suit for breach of contract against a seller of a furnace which cause a fire that destroyed Plaintiff's home and contents. *Id*. at 20-21. Plaintiff's alleged mental distress arising from the loss. *Id*. The Court applied the rule from *Kewin*, and denied any damages to Plaintiff on the grounds of mental distress. *Id*. at 23-24.

In *Butt v Detroit Automobile Inter. Insurance Exchange*, 129 Mich App 211 (1983), the Court of Appeals was again faced with this question. Plaintiff's wife was killed in an auto accident and insurer refused to pay maximum amount of replacement service benefits. Plaintiff alleged that Defendant was liable for intentional infliction of emotional distress. *Id*. at 214-215. The Court of Appeals, again applying the *Kewin* rule held that damages for mental distress are not available for breach of an insurance contract.  *Id*. at 217-218.

*Young v Michigan Mutual Insurance Company*, 139 Mich App 600 (1984) involved this same issue again.  Plaintiff claimed that "defendant's bad faith acts or omissions caused him hardship, anxiety, outrage and inconvenience."  *Id*. at 606.   Again the Court reaffirmed *Kewin*

9

when it declared the damages for mental distress are unavailable in a breach of contract action. *Id*. at 606-607.

Finally, in *Shikany v Blue Cross and Blue Shield of Michigan*, 134 Mich App 603 (1984) the *Kewin* decision was again reaffirmed. In *Shikany*, Plaintiff commenced an action for exemplary damages arising out of an alleged breach of insurance contract. *Id*. at 605. The Court found that recovery of damages for mental distress is not allowed in an action for breach of contract absent evidence that such damages were within the contemplation of the parties at the time of contract. *Id*. at 608-610. See also *Hajciar v Crawford and Company*, 1422 Mich App 632 (1984); *Tennent v State Farm Mutual Automobile Insurance Company*, 143 Mich App 419 (1985).

It should not be said that there is no exception to the *Kewin* holding. In *Stewart v Rudner*, 349 Mich App 459 (1957) recognized by the *Kewin* Court, Plaintiff sued her doctor for breach of an agreement to deliver her child by Caesarean Section, alleging that this breach resulted in the still birth of her child. The Court allowed damages for mental distress holding that where the contract breaches a ***personal agreement*** involving matters of "mental concern and solicitude", damages for emotional suffering are recoverable. *Stewart, supra* at 469.

The Court in *Kewin*, however, easily distinguished *Stewart* by differentiating between personal agreements and those dealing with trade commerce.

> Insurance contracts for disability income protection do not come within the reach of *Stewart*. Such contracts are commercial in nature; they are agreements to pay a sum of money upon the occurrence of a specified event, *Secor* v *Pioneer Foundry Company*, 20 Mich App 30, 35; 173 NW2d 780 (1969); 14 Michigan Law & Practice, Insurance §71, p 50. The damage suffered upon the breach of the insurance contract, as with almost any agreement results in some annoyance and vexation. But recovery for those consequences is generally not allowed, absent evidence that they were within the contemplation of the parties at

10

the time the contract was made. 22 Am Jur 2d, Damages §64, p 97.

*Kewin*, supra at 416-417.

Cases where damages for emotional disturbance are typically allowed are (1) where the emotional disturbance complements a bodily injury and (2) in the "exceptional situation, the contract or breach is of such a kind that serious emotional disturbance was a particularly likely result.  Common examples are contracts of carriers and innkeepers with passengers and guests." *Kewin*, supra at 416 (citing the comment section, Restatement Contracts, 2d (Tentative Draft No. 14, 1979), §367, 100-101).

Clearly the facts of the case at bar are within the four corners of the *Kewin* rule. Plaintiff has attempted to obtain damage relief for emotional distress and other non-contractual damages arising from an alleged breach of contract.  As is evidence from the case law cited above, such a recovery is not allowed.  As is evidenced by the below cited cases, a ruling in *Kewin* with respect to the fact that no mental anxiety or intentional infliction of emotional distress damages are allowed, holds true for breach of insurance contract actions.   Also see *Butler v Detroit Automobile Inter-Insurance Exchange, 121 Mich App 727, 329 N.W.2d 781 (1982).*

In *Wendt v Auto Owners Insurance Company*, 156 Mich App 19; 401 NW2d 375 (1986), the insured brought action against the insurer for breach of contract, negligent handling of the claim, and intentional infliction of emotional distress, after the insurer failed to settle Plaintiff's claim for collision damage to his vehicle. In analyzing Plaintiff's claim for emotional distress, the *Wendt* Court stated as follows:

> In the case at bar, the conduct of which plaintiff complains in Count III is the negligent adjustment of plaintiff's claim (incorporated from Count II) and the intentional and willful 'refus[al] to settle plaintiff's collision damage claim according to the terms of its contract with plaintiff and according to the laws of the State of Michigan.' Plaintiff's allegation that defendant negligently adjusted his claim

> falls short of the requirement that the conduct be intentional and reckless. Furthermore, plaintiff's allegation that Defendant intentionally or willfully refused to settle plaintiff's claim fails to meet the extreme and outrageous criteria that alleged conduct must be for a claim of intentional infliction of emotional distress. The mere failure to pay a contractual obligation, without more, does not amount to outrageous conduct for purposes of this tort. *Roberts*, *Supra*, at 605. Even a willful or bad faith failure to do so does not meet this criteria. See *Roberts*, *supra* at 608. Thus we find that plaintiff has failed to adequately plead the elements of an independent action for intentional infliction of emotional distress and confirm the grant of summary judgment on this claim.

*Wendt, supra* at 24-25 (citing *Roberts v Auto Owners Insurance Company*, 422 Mich 594; 374 NW2d 905, 910 (1985).

In *Crossley v Allstate Insurance Company*, 155 Mich App 694; 400 NW2d 625 (1986), a similar cause of action was alleged by Plaintiff. There, the insured sued Defendant, Allstate Insurance Company, for breach of contract, unfair trade practices, and emotional distress in connection with the insurer's rejection of the insured's Proof of Loss from a fire to his garage and home. In ruling out Plaintiff's allegations of emotional distress, the *Crossley* Court refused to sustain such a cause of action, stated as follows:

> The instant plaintiff rests his mental distress damages claim on defendant's alleged failure to reasonably investigate his claim and alleged deliberate oppression of plaintiff to deny him benefits. The underlying factual allegation is defendant's 'accusing" plaintiff, David Crossley, of arson and fraud when defendant had absolutely no evidence whatsoever to support those allegations'.
>
> From the allegations in plaintiff's complaint, it is clear that the alleged "accusation" was responsive to plaintiff's filing of a proof of loss. Plaintiff has alleged, at most, a bad faith attempt by defendant to avoid paying under the insurance contract. No claim arising independent of the contract has been stated. Defendant's response to plaintiff's proof of loss was not a type which would cause an average member of the community to scream "outrageous!"

*Crossley, supra*, at 699.

The cases cited above are indistinguishable from the factual situation presented in the instant matter. Plaintiffs' allegations herein arise out of alleged wrongful failure to pay insurance proceeds. As stated by the authority above, these allegations do not set forth a recognizable recoverable cause of action in an insurance contract dispute simply by claiming bad faith, emotional distress and other exemplary damages.

In light of the above authority, it is clear that Defendant is entitled Summary Disposition of Plaintiffs' claims for emotional distress, bad faith, and other exemplary damages.

Defendant, Liberty Mutual Insurance Company, would ask this Court to apply the reasoning in *Kewin* and the subsequent cases by finding that the insurance contract in question calls for payment of money upon the occurrence of a specific event, the entitlement to proceeds for damages sustained to Plaintiff's dwelling and personal property in the dwelling. The insurance contract is a commercial contract for which damages for emotional or mental distress are not recoverable. Likewise, damages for emotional pain and suffering are not damages contemplated by the parties and are damages that do not naturally arise for the alleged contractual breach.

### C. Plaintiff Mistakenly Relies On A Line Of Cases Involving A Non-Contractual Issue In Support Of Seeking Damages for Bad Faith.

To support his claim of bad faith, Plaintiff mistakenly relies on case law involving liability insurance companies assuming the defense of an insured. For these cases, a claim of bad faith is applicable when the liability insurer *fails to settle a case within policy limits* therefore exposing the insured and/or his excess insurer to risk. This is known as the "excess judgment problem."

Defendant submitted interrogatories to Plaintiff specifically requesting "in full and complete detail the factual basis for your allegation in your Second Amended Complaint of Bad

Faith, which is Count II."     In response, Plaintiff cited *Commercial Union Ins. Co. v. Liberty Mutual Ins. Co*., 426 Mich. 127; 393 N.W.2d 161 (1986).  (**Exhibit 11**).  In *Commercial Union*, an excess insurance carrier filed an equitable subrogation action against the primary liability insurance carrier for alleging that the primary carrier's failure to negotiate a settlement in a case against their mutual insured constituted bad faith pursuant to *City of Wakefield v. Globe Indemnity Co*., 246 Mich 645; 225 NW 643 (1929).  *Id*. at 130.

   *Wakefield* is the leading case in Michigan on this point.  In *Wakefield*, the Court held that liability insurers were not liable to the insured for refusal to compromise a claim unless the refusal was in bad faith.  *Wakefield, supra* at 651.    The Court explained that due to the control that the liability insurer has over settlements in these cases, that a duty must be imposed "to use its discretionary power of settlement in good faith."  *Id*. at 651.    This scenario is simply not applicable to the present case.

   The *Commercial Union* case goes on to define bad faith as "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owned a duty."  *Commercial, supra* at 136.    Furthermore, the Court proceeded to articulate twelve "factors" to be considered in deciding whether a defendant has acted in bad faith.  None of the factors are applicable to the matter at issue.  The factors are all case specific to the issue of whether a primary insurer's failure to negotiate a settlement constituted bad faith.   Those factors are as follows:

1. Failure to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interest of the insured.
2. Failure to inform the insured of all settlement offers that do not fall within the policy limits.
3. Failure to solicit a settlement offer or initiate settlement negotiations when warranted under the circumstances.
4. Failure to accept a reasonable compromise offer of settlement when the facts of the case or claim indicate obvious liability and serious injury.
5. Rejection of a reasonable offer of settlement within the policy limits.
6. Undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high.

7.      An attempt by the insurer to coerce or obtain an involuntary contribution from the insured in order to settle within the policy limits.

8.      Failure to make a proper investigation of the claim prior to refusing an offer of settlement with the policy limits.

9.      Disregarding the advice or recommendations of an adjuster or attorney.

10.     Serious and recurrent negligence by the insurer.

11.     Failure to take an appeal following a verdict in excess of the policy limits where there are reasonable grounds for such an appeal, especially where trial counsel so recommended.

*Id*. at 138-139.

In summary, *Wakefield* and its progeny are distinguishable and they are simply not applicable to the current matter.

### D.  Failure To Defend (contractual) vs. Failure To Settle A Claim (non-contractual)

In *Stockdale v. Jamison*, 416 Mich 217; 330 NW2d 389 (1982), The Michigan Supreme Court was presented with an issue similar to the *Wakefield* line of cases, however the Court distinguished between a failure to defend an insured, which is contractual therefore bad faith does not apply vs. a failure to settle a claim, which is non-contractual therefore bad faith applies.

In *Stockdale,* Farm Bureau Insurance was required under the terms of the automobile policy "'to defend any suit against the insured seeking damages on account of *** bodily injury or property damage' arising out of the 'ownership, maintenance or use' of the vehicle described in the policy or a vehicle which 'replaces' that vehicle.  *Id*. at 221 (quoting policy language). Farm Bureau learned that their insured had been driving a different vehicle from the one described in the policy and believed the vehicle was not a "replacement" according to the terms of the policy.  Therefore, Farm Bureau denied coverage and did not represent the insured in a lawsuit filed against him.  A default judgment was taken against the insured and Farm Bureau. *Id*. at 221-222.

Farm Bureau's argument was that they denied coverage in good faith and that "'absent a showing of bad faith, an insurer's liability for failure to tender a defense to its insured is limited

15

to the face amount of the policy.'" *Id*. at 222-223.  The Michigan Supreme Court held that "while good faith may limit an insurer's liability to policy limits in actions for failure to settle, it is not a defense to an action for breach of an insurer's obligation to defend its insured."  *Id*. at 223-224. Citing *Wakefield*, the court explained the rational for allowing bad faith in claims involving a failure to settle as follows:

> The rule subjecting an insurer to liability to its insured in excess of policy limits for ***failure to act in good faith in settlement negotiations*** recognizes that where the insurer defends the action it has a ***substantial measure of control*** in the conduct of the lawsuit and is in a position to disregard the interest of the insured and ***expose him to the risk of a judgment in excess of policy limits***.  To protect the insured's interest, the courts have required that the insurer make reasonable efforts to settle within policy limits.

*Stockdale, supra* at 223-224 (Citations omitted)(Emphasis added).

Citing *Kewin*, the Court then distinguished cases involving a duty to defend.

> The ***duty to defend***, however, ***arises solely from the language of the insurance contract.  A breach of that duty can be determined objectively, without reference to the good or bad faith of the insurer***. If the insurer had a obligation to defend and failed to fulfill that obligation, then, like any other party who fails to perform its contractual obligations, it becomes liable for all ***foreseeable damages*** flowing from the breach.   As this Court said in *Kewin v. Massachusetts Mutual Life Ins. Co*., 409 Mich. 401, 420; 295 N.W.2d 50 (1980), holding that an insured cannot recover exemplary damages or damages for mental distress for breach of an insurance contract: 'In the commercial contract situation, unlike the tort and marriage contract actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation.  ***The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith***.'

*Stockdale, supra* at 224 (Citations omitted)(Emphasis added).

In summary, the *Stockdale* decision points out the flaw in Plaintiff's reliance on the *Wakefield* line of cases and emphasizes the fact that pursuant to *Kewin*, because Plaintiff's underlying cause of action is for breach of a commercial contract which is susceptible to an accurate pecuniary estimation, there is no basis for a claim of bad faith.

16

**IF A CLAIM OF BAD FAITH WAS PERMISSIBLE, DEFENDANT IS NOT ABLE TO ESTABLISH THE DEFENDANT ACTED IN BAD FAITH IN DENYING PLAINTIFF'S INSURANCE CLAIM.**

For the sake of argument, applying the definition of bad faith as stated in *Commercial Union Ins. Co. v. Liberty Mutual Ins. Co*., 426 Mich. 127; 393 N.W.2d 161 (1986), "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owned a duty", there is no evidence to support that Defendant acted in bad faith in denying Plaintiff's claim.

**A.  Plaintiff's "Evidence" of Bad Faith**

As previously noted, Defendant submitted interrogatories to Plaintiff specifically requesting "in full and complete detail the factual basis for your allegation in your Second Amended Complaint of Bad Faith, which is Count II."   Plaintiff responded to the interrogatory providing a list of seven evidentiary issues to support his argument.   (***See Exhibit 11).***  Defendant will address each of those issues.

> **1.  Kevin O'Reilly and Karl Intemann repeatedly contacted Detective Crittenden and Prosecutor Louisa Papalas to inquire when the case would be prosecuted and advising that the instant lawsuit had been filed.**

Redford Township, specifically, Detective/Sergeant Kevin Crittenden conducted his own independent investigation into this fire loss.    In addition, Det/Sgt Crittenden made the independent decision to request a warrant to pursue criminal charges against Plaintiff for the arson of his dwelling.   Defendant did not have an role in determining if charges should be filed.  Furthermore, Prosecutor Louisa Papalas also conducted her investigation, independent of Defendant's.   Both Det/Sgt Crittenden and Prosecutor Papalas did not provide Defendant with any file documentation regarding their investigation until well after criminal charges were filed against Plaintiff in February 2012, *eight months after Defendant denied Plaintiff's claim*.  (*See*

*Exhibit 12, register of actions and See Exhibit 8,  denial letter*).    They were reluctant to provide any information to Defendant to preserve the integrity of the criminal case against Plaintiff.  (**See *Exhibit 2, p. 1 & 2 of 38).***

Plaintiff paints a situation where Defendant is constantly reaching out to Det/Sgt Crittenden and Prosecutor Papalas seeking information and urging prosecution.    This is completely false.    It was Det/Sgt Crittenden and Prosecutor Papalas who reached out to Defendant.  Defendant received a request from Det/Sgt Crittenden dated November 1, 2010, pursuant to MCLA 29.4 of the Fire Prevention Code, requesting Defendant's insurance information relating to Plaintiff's home and their fire investigation file materials.  (**See *Exhibit 4***).

Similarly, Wayne County Prosecutor Papalas submitted a request dated July 1, 2011 pursuant to MCLA 500.4507 of the Insurance Code and MCLA 29.4 requesting the same information.  (**See *Exhibit 9***).  It should be noted that the prosecutor's request was received one month after Defendant denied the claim.

Prosecutor Papalas also submitted a request dated July 12, 2011 to AAA Insurance pursuant to the same statutory provisions.  (***Exhibit 13***).  Prosecutor Papalas was seeking claim file materials concerning Plaintiff's 2007 felony conviction for insurance fraud relating to a AAA claim.   Is AAA now guilty of bad faith for sharing their file materials?

Karl Intemann only reached out to Det/Sgt Crittenden and Prosecutor Papalas after Plaintiff filed his lawsuit in October 2011, seeking materials for the defense of the lawsuit.  (**See *Exhibit 2, p. 1&2 of 38***).    Despite his request, that information was not provided to Mr. Intemann at that time.

There are two statutes which "similarly foster the communicative and evaluative

processes related to fire prevention and insurance fraud prevention." *Radu v. Herndon &*
*Herndon Investigations, Inc.* WL 4608896 at *7 (Mich App, August 29, 2013). (**Exhibit 14**).
Those statutes are MCL 29.4 of the Fire Prevention Code and MCL 500.4509 of the Insurance
Code. "Both statutory provisions clearly grant the protection of immunity to persons who have
provided information related to investigations of suspected arson and suspected insurance fraud
if they acted without malice." *Id.* The definition of malice is the same definition used in
defamation actions. *Id.*

MCLA 29.4(6) provides:

> In the absence of fraud or malice, an insurance company or a person
> who furnishes information on behalf of an insurance company is not
> liable for damages in a civil action or subject to criminal prosecution
> for an oral or written statement made or other action taken that is
> necessary to supply the information required under this section.

MCLA 500.4509(3) provides:

> In the absence of malice, an insurer, or any officer, employee, or
> agent of an insurer, or any person who cooperates with, furnishes
> evidence, or provides information regarding suspected insurance
> fraud to an authorized agency . . . is not subject to civil liability for
> libel, slander, or any other tort, and a civil cause of action of any
> nature does not exist against the person, for filing a report, providing
> information, or otherwise cooperating with an investigation or
> examination of any of these entities, unless that person knows that the
> evidence, information, testimony, or matter contains false information
> pertaining to any material fact or thing.

Any communication that took place between Defendant, Redford Township and The
Wayne County Prosecutor's office took place pursuant to the Fire Prevention Code and the
Insurance Code. Furthermore, this was not a two way street and Redford Township and the
Prosecutors office did not share information with Defendant until after Plaintiff was criminally
charged in February 2013.

**2. Kevin Pike knew that the appropriate classification for the fire was
"undetermined," as set forth in NFPA 921 (2011), and did not advise Kevin**

**O'Reilly of that fact.**

**AND**

**3.  Kevin Pike, Defendant's agent, chose not to divulge his knowledge that the proper classification of the fire was "undetermined," no "incendiary."**

In order to believe this statement you must assume that three premises are true:  (1) That the *2011 version* of NFPA 921 was in existence at the time Kevin Pike conducted his origin and cause investigation, (2) that Kevin Pike's methodology that he used in conducting his origin and cause was improper at the time, and (3) that NFPA 921 is the single authoritative source for conducting fire investigations.  I submit to this Court that all three of these premises are false.

First, both the 2008 and 2011 editions of NFPA 921 state that it is a "***Guide***" for fire & explosion investigations.  (***Exhibit 15)***.  NFPA 921, section 3.2.3 defines "Guide" as "A document that is advisory or informative in nature and that contains only ***nonmandatory provisions***.  A guide may contain mandatory statements such as when a guide can be used, but the document as a whole is ***not suitable for adoption into law***."  3.2.3 NFPA 921 (2008)(Emphasis added).  (***Exhibit 16***).

Moreover, NFPA 921 2011 is not retroactive and it is not peer reviewed.  "While the committee believes this document is a model for modern fire investigations, it is for others, not the committee, to declare the text to be authoritative.  In addition, under the NFPA process, this document is produced using a consensus process and ***is not technically a peer reviewed document.***"  Report on Proposals F2010, Committee Statement on rejection of proposal for retroactivity. (***Exhibit 17***).

Lastly, Section 1.3.2 states that "As every fire and explosion incident is in some way unique and different from any other, ***this document is not designed to encompass all the necessary components of a complete investigation or analysis of any one case***."  1.3.2 NFPA

921 (2008)(Emphasis added) (*See Exhibit 16*).  This section essentially acknowledges that other fire investigative authorities exist, such as Kirk's Fire Investigation and Forensic Fire Scene Reconstruction (*Exhibit 18).*

The date of this fire loss was October 23, 2010.  Kevin Pike conducted his investigation on October 28, 2010 using a methodology called the process of elimination and concluded that the fire was incendiary.   (**See** *Exhibit 3*).   At the time of his investigation, the only version of NFPA 921 in existence was the 2008 edition.  The 2011 edition was not released until March 2011.  (**See** *Exhibit 15*). Therefore, at the time Kevin Pike completed his investigation it was conducted properly under the 2008 edition of NFPA 921.

To now argue that somehow Kevin Pike's investigation is completely improper due to a change in NFPA 921 months after his investigation is completely is absurd.   A case cited by Plaintiff says it best, "[I]t is *inappropriate* in reviewing the conduct of the insurer to utilized '20/20 hindsight vision.'   The conduct under scrutiny must be considered in light of the *circumstances existing at the time*.  A microscopic examination, years after the fact, made with the luxury of actually knowing the outcome of the original proceeding is not appropriate." *Commercial Union*, supra at 139.

Not only was Kevin Pike's methodology proper under the 2008 edition of NFPA 921, it is also proper under the 2011 edition and Kevin Pike stands by his classification that the fire was incendiary.

### 4.  Kevin O'Reilly did not timely call witnesses to verify Horace Lee's story.

The fact of the matter is that Mr. O'Reilly did contact witnesses after Plaintiff decided to provide Mr. O'Reilly with the full names and contact information of the witness with him the night of the fire, during his March 14, 2011 Examination Under Oath.  Mr. O'Reilly had initially

conducted a recorded interview of Plaintiff on December 10, 2010, which was shortly after he became involved in the investigation.   At that time, Plaintiff only provided the name of Kev, Eric and Rick and Lisa whom he was with that evening.  (See **Exhibit 5, p. 42-44**).  Furthermore, during the Examination Under Oath, Plaintiff provided Mr. O'Reilly with the name of a new witness who he saw that evening, that he never previously mentioned to any investigators, his sister Vanessa Ervin.  (**Exhibit 19, p. 77**).

Any delay that occurred was due to the fact that Plaintiff had provided multiple inconsistent statements to Defendant and other investigators leaving Defendant unsure of Plaintiff's whereabouts on the evening of the fire and who he was with.   Furthermore, if there was a delay, it was negligible and certainly would not arise to the level of bad faith.

**5. Kevin O'Reilly admitted he had no expertise in cell tower technology, and chose not to confirm whether Det. Crittenden had expertise in cell tower technology.**

It is puzzling as how this information could possibly be interpreted as bad faith.   It is important to keep in mind that this investigation occurred in late 2010.  Mr. O'Reilly was not concerned with attempting to qualify Det./Sgt. Crittenden as an expert witness.  Sprint had provided the cell phone tower records relating to Plaintiff's cell phone tower use that evening and it was clear that Det./Sgt. Crittenden, who holds a degree from the University of Michigan, had a clear understanding of cell phone tower technology.

**6. Mr. O'Reilly chose not to investigate Mr. Lee's explanation that he was at Lucky's Bar in Southfield from shortly after midnight until he came home after 2:00 a.m.**

Mr. O'Reilly testified that he chose not to visit Lucky's because Plaintiff advised him that he paid cash that evening therefore there would be no paper trail to support he was there, he was at the bar alone, and he believed that it was doubtful that a bartender would recall a random patron on a Friday night, which is a typical busy bar night.  Mr. O'Reilly admitted that in "20/20

hindsight" he wished that he would have gone to the bar; however, it would not have impacted the ultimate claim decision.

It is important to point out that during Plaintiff's multiple statements to the Defendant and authorities he never informed them they he and his friends had a "standing date" to meet up at Lucky's Bar every Friday night.   That was not divulged until his recent deposition.  (**Exhibit 20, p. 14-17).**   If Plaintiff had been forthcoming during his interviews, perhaps Mr. O'Reilly would have placed more weight on the investigation of Lucky's.   Mr. O'Reilly's failure investigate Lucky's bar is at best characterized as heedless and clearly does not arise to the level of bad faith.

### 7. Mr. O'Reilly made several material misrepresentations to the jury, which were either outright lies or half-truths intended to leave a false impression of the facts.

As noted by Plaintiff, Kevin O'Reilly is a retired veteran Detective with the Dearborn Police Department and he has an unblemished record.  To accuse him of perjury in the criminal matter is truly insulting.  Not only did Mr. O'Reilly testify truthfully to the best of recollection, he was also subject to cross examination by Plaintiff's criminal defense attorney.   Furthermore, all of these "misrepresentations" that were allegedly made by Mr. O'Reilly occurred during the criminal prosecution of the Plaintiff, *over one year after the claim was denied*.  Plaintiff's claim of bad faith is premised on the denial of the claim.

**Plaintiff's finances**:

During his investigation, Mr. O'Reilly had attempted to ascertain Plaintiff's financial standing.   Despite repeated requests, Plaintiff was extremely vague regarding his finances.  He testified that he had inherited a large sum of money from his mother, approximately $100,000.00, however, when asked to explain the whereabouts of those funds he used phrases such as "circulating" and vague "investments" without divulging any details.  He claimed that he

23

used a large sum of the money for the purchase of the loss location and simply could not account for the rest of the funds.   During his deposition Plaintiff increased that amount to $130,000.00. (See *Exhibit 20, p. 8*.)

Perhaps if Plaintiff had simply told investigators that he kept $17,000 in cash in a brown bag, in a crawl space under his home, that he could only access through the floor in the laundry room and that he went back into the home after the fire to retrieve that money, perhaps we would not be here today.   Oh, and no one except for Plaintiff knew about this money.  Instead, he chose not to divulge this information until his deposition in May 2013, almost 2 ½ years after the fire loss.  (See *Exhibit 20, p. 15-17*).   That money is now gone and providing this information 2 ½ years after the fact is certainly convenient.

**The time that Plaintiff left his house before going to Lucky's**:

Plaintiff will argue that Mr. O'Reilly testified during the criminal trial that Plaintiff advised him that he was last in the home around 11:00 p.m.   Well, this statement is actually fairly accurate.   Now, the Plaintiff never made the statement directly to Mr. O'Reilly during his December 10, 2010 recorded interview, however, Plaintiff did make this statement during his EUO at which Kevin O'Reilly attended.  (See *Exhibit 19,  p. 38-39*).

Plaintiff had given multiple, conflicting statements to multiple individuals regarding his whereabouts that evening and the times that he arrived and left his home.   Mr. O'Reilly simply made a mistake as to when Plaintiff told him this information.   Again, he was subject to cross examination and that mistake could have easily been corrected by the criminal defense attorney.

**B. Defendant Paid Plaintiff Thousands Of Dollars In Additional Living Expenses, Advances and Board Up Costs.**

If Defendant truly acted in an "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owned a duty (Plaintiff)," then Defendant certainly would not have

paid any monies towards Plaintiff's claim.   Defendant actually paid a substantial amount of money, $28,791.00 to be exact, under Plaintiff's policy.  (**See *Exhibit 1***). Specifically, they paid the following:

**Additional Living Expenses:  $22,715**

**Advances:     $3,000**

**Board Up:     $3,076**

This is irrefutable evidence and it clearly establishes that Defendant did not act in bad faith in denying Plaintiff's claim.

<u>**RELIEF REQUESTED**</u>

In light of the above authority being applied to the allegations contained in Plaintiff's Second Amended Complaint, Defendant is entitled to summary disposition of Plaintiff's Count II seeking damages claims for mental and emotional distress, financial distress as well as any of the Plaintiff's claims for exemplary damages arising from the alleged bad faith of the Defendant.

WHEREFORE, Defendant, Liberty Mutual Insurance Company, prays that this Honorable Court grant partial summary judgment as to any and all causes of action set forth in Plaintiff's Second Amended Complaint for exemplary damages for bad faith and emotional distress and grant such other relief as this Court deems appropriate.

Respectfully submitted,

**Hewson & Van Hellemont, P.C.**

BY:    <u>/s/ Jerald Van Hellemont</u>
Patrick M. Anthony (P61344)
Jerald Van Hellemont (P32173)
Attorney for Defendant
(248) 968-5200
JVH@vanhewpc.com
(P61344)

Dated:  September 24, 2013

25